STATE OF CONNECTICUT *v.* MICHAEL W.
MORDOWANEC
(SC 16251)

McDonald, C. J., and Borden, Katz, Palmer and Sullivan, Js.[1]

[1] Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion was officially released, his continued

Argued April 20, 2000—officially released January 22, 2002

participation on this panel is authorized by General Statutes § 51-198 (c). The listing of justices reflects their seniority status on this court as of the date of oral argument.

*Ira B. Grudberg*, with whom was *Alinor C. Sterling*, for the appellant (defendant).

*Bruce R. Lockwood*, deputy assistant state's attorney, with whom, on the brief, were *Mary M. Galvin*, state's attorney, *Francis J. McQuade*, supervisory assistant state's attorney, and *John Kerwin*, assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, C. J. The defendant, Michael W. Mordowanec, appeals from his conviction, rendered after a conditional plea of nolo contendere, of the crimes of cultivation of marijuana in violation of General Statutes § 21a-277 (b), possession of four ounces or more of marijuana in violation of General Statutes § 21a-279 (b), and possession of drug paraphernalia in a drug factory situation in violation of General Statutes § 21a-277 (c).[2]

[2] General Statutes § 21a-277 (b) provides in relevant part: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with intent to sell or dispense, possesses with intent to sell or dispense, offers, gives or administers to another person any controlled substance, except a narcotic substance . . . may, for the first offense, be fined not more than twenty-five thousand dollars or be imprisoned not more than seven years or be both fined and imprisoned; and, for each subsequent offense, may be fined not more than one hundred thousand dollars or be imprisoned not more than fifteen years, or be both fined and imprisoned."

General Statutes § 21a-279 (b) provides in relevant part: "Any person who possesses or has under his control . . . four ounces or more of a cannabis-type substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than five years or be fined not more than two thousand dollars or be both fined and imprisoned, and for a subsequent

On appeal, the defendant claims that the trial court improperly: (1) determined that a warrantless thermal imaging scan of the defendant's commercial premises did not constitute a search under the federal and state constitutions; (2) concluded that the defendant had failed to establish that false information was included intentionally or recklessly in the application for a warrant to search those premises, in violation of *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); and (3) determined that there were sufficient facts in the affidavit accompanying the search warrant application to establish probable cause. We affirm the judgment of the trial court.

The following facts are relevant to the defendant's claims on appeal. On February 9, 1996, a judge of the Superior Court issued a warrant to search the business premises of L & M Home Improvement (L & M) at 151 Main Street in Seymour. Seymour police officers executed that warrant and discovered on L & M's second floor nineteen marijuana plants, lights used to grow the plants and other items relating to indoor marijuana cultivation and sales.[3] As a result, the defendant and

offense may be imprisoned not more than ten years or be fined not more than five thousand dollars or be both fined and imprisoned."

General Statutes § 21a-277 (c) provides: "No person shall knowingly possess drug paraphernalia in a drug factory situation as defined by subdivision (20) of section 21a-240 for the unlawful mixing, compounding or otherwise preparing any controlled substance for purposes of violation of this chapter."

The original information also charged the defendant with cultivation of marijuana in violation of General Statutes § 21a-278 (b), but that charge was dropped when the defendant entered his plea of nolo contendere.

[3] According to the trial court's memorandum of decision, "[t]he inventory for property seized contains 40 entries for items seized, including: (1) 19 plastic buckets, each containing soil and 1 marijuana plant (approximately 6 feet tall); (2) assorted greenish plant-like material; (3) 2 clear plastic bags containing ground-up greenish plant-like material; (4) 1 box of 'Gro-Best' plant food; (5) 1 box of Zip-loc baggies; (6) 1 box of 'Miracle-Gro' plant food; (7) 1 white hand shovel; (8) 1 'Intermatic' electric timer; (9) 1 pair of handled scissors; (10) 1 pair of wire strippers; (11) 1 pair of snips; (12) 1 'AR 20 Colored Floor Grout' color chart; (13) 2 sponges; (14) 1 wooden handled trowel; (15) 2 'Windex' spray bottles containing a clear liquid; (16)

his brother, Daniel Mordowanec,[4] the operators of L & M, were arrested and charged.

Prior to trial, the defendant moved to suppress all evidence seized pursuant to the search warrant, arguing that the warrant was obtained in violation of his rights under the fourth and fourteenth amendments to the United States constitution, and article first, §§ 7 and 8, of the Connecticut constitution.[5] In the trial court, the

1 small plastic watering can; (17) 1 metal pitcher; (18) 1 plastic bucket; (19) 1 'Tork' time control unit; (20) 1 15-pound bag of 'Hyponex All-Purpose Potting Soil'; (21) 4 five-gallon plastic buckets, 2 containing soil and 1 containing a length of electric wire; (22) 1 cardboard box containing 4 'Wide Spectrum Plant & Aquarium' 48-inch 48-watt tubular light bulbs; (23) 1 electric extension cord; (24) 1 4-bladed electric ceiling fan; (25) 3 empty prescription bottles issued to [the defendant]; (26) 1 plastic tube approximately two inches in length containing a residue; (27) plant-like seeds contained in two plastic baggies and one prescription bottle; (28) 1 25-pound bag of 'Frank's All Purpose Natural Fertilizer'; (29) 1 bag of 'Scott's' potting soil (nearly empty); (30) 1 pair of cloth gloves; (31) 1 glass ashtray containing remnants of tobacco and marijuana cigarettes; (32) 6 white plastic soil pots; (33) 6 ceramic soil pots; (34) 1 beige plastic soil pot; (35) 4 8-foot fluorescent lighting fixtures containing 2 'Gro-Lux' bulbs each; (36) 2 4-foot fluorescent lighting fixtures containing 4 'Plant & Aquarium' bulbs each; (37) 1 yellow electric extension cord; (38) 2 'Gro-Lux' 8-foot fluorescent bulbs; (39) documentation consisting of SNETCO bill, states sales and tax use permit and Amoco statement; (40) 1 'Lakewood' 1500-watt electric heater."

[4] The defendant's brother was convicted of cultivation of marijuana in violation of § 21a-277 (b) and possession of marijuana in violation of § 21a-279 (b). The trial court sentenced him to two concurrent sentences of four years, execution suspended, with four years probation. Daniel Mordowanec did not appeal from his judgment of conviction.

[5] The fourth amendment to the United States constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." The fourteenth amendment to the United States constitution provides that no state shall "deprive any person of life, liberty or property, without due process of law . . . ."

Similarly, article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." Article first, § 8, provides that no person shall "be deprived of life, liberty or property without due process of law . . . ."

defendant argued that the evidence seized in the execution of the warrant should be suppressed because the affidavit in support of the warrant did not present sufficient evidence for a finding of probable cause. The defendant's motion to suppress included a request for a hearing pursuant to *Franks* v. *Delaware,* supra, 438 U.S. 154.[6] In its memorandum of decision, the trial court noted that although it "felt that the [defendant] initially failed to sufficiently demonstrate that the affiants acted with 'deliberate falsehood or reckless disregard for the truth,' the court nevertheless gave the [defendant] the benefit of the doubt and allowed preliminary testimony in a *Franks*-type hearing."

In its memorandum of decision, the trial court found the following facts: "The application for the warrant was supported by the affidavit of Det./Sgt. James Hayes of the Seymour police department and Special Agent David Hoyt of the [United States] Drug Enforcement Administration. The application and affidavit contained several basic allegations. First, Officer Hayes received an anonymous [tele]phone call from an unknown male caller who stated that he observed approximately twenty to twenty-five six-foot tall marijuana plants growing inside a room under tubular, purplish lights on the second floor of the building housing [L & M]. The caller stated that he made the observation through a slightly opened door from the rear fire escape of the building while taking a cigarette break from a karate class, which is located on the third floor of the building, in which his child was enrolled. The caller also indicated that he detected a strong odor of marijuana, claiming

---

[6] In *Franks* v. *Delaware,* supra, 438 U.S. 155–56, the United States Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."

that he 'knows marijuana citing the fact that he is a "Vietnam vet.'" Affidavit and Application for Search and Seizure Warrant, ¶3. The caller described two males located on the second floor who he believed to be 'the guys from L & M,' one heavy-set and balding and the other with glasses and his hair tied back in a ponytail. Id. He also stated that he did not think the males saw him and that 'you better move quick or [you're] gonna lose it.' Id.

"The second affiant, Special Agent Hoyt, attested to his knowledge from 'training and experience that individuals who grow marijuana indoors commonly utilize 1,000 watt metal halide or high pressure sodium lights to' grow marijuana, and that the lights appear 'bluish in color.' Affidavit and Application for Search and Seizure Warrant, ¶4.

"In paragraph 5, Officer Hayes indicated that from his personal knowledge the descriptions of the two males fit Daniel [Mordowanec] and [the defendant]. He further verified by a visit to the third floor of 151/153 Main Street that there was an enclosed fire escape stairway in the rear of the building. See Affidavit and Application for Search and Seizure Warrant, ¶6. In addition, assessor's records were obtained which showed that the building was owned by the [defendant's] mother.

"The second allegation relied upon in the application for the search warrant was a claimed increase in the electrical power usage at the property. On February 7, 1996, an administrative subpoena was obtained and executed at Northeast Utilities for records of kilowatt electrical usage covering two years of service for 151 Main Street. The records revealed 'a clear kilowatt hour usage increase [of 474 kilowatt hours] . . . for the period covering December 1995 to January of 1996 as compared to the previous one month period, and more significantly, when compared to the same one month

period one year ago.' Affidavit and Application for Search and Seizure Warrant, ¶8.

"The final allegations relied upon in the application were the results of an external inspection of the heat emanating from the building at 151/153 Main Street through employment of a thermal imaging device. On February 9, 1996, at approximately 12:30 a.m., two Seymour police detectives and a Connecticut state police trooper fixed an 'Agema' Model 210 thermal imaging device on the building. Affidavit and Application for Search and Seizure Warrant, ¶9, 10. The device measured 'a significantly higher surface temperature on the second floor than that of the first and third floors and adjacent buildings.' Affidavit and Application for Search and Seizure Warrant, ¶10. The affiant concluded that '[t]his is consistent with the heat that would be generated by the high power artificial lighting systems commonly used in the indoor cultivation of marijuana.' Id. Furthermore, upon inspection of the town of Seymour building permits and assessor's field card, it was evident that 'only one oil fired hot water furnace [was] being used to heat said structure and . . . this furnace is located in the basement of the building and would not explain a high amount of heat emanating from the second floor.' Affidavit and Application for Search and Seizure Warrant, ¶11."

The trial court then rejected each of the defendant's arguments in support of his motion to suppress. The court stated that "[a]lthough the [defendant] demonstrated that the evidence of electrical kilowatt usage obtained by the affiants applied to the wrong floor of the building at 151/153 Main Street, the [defendant has] failed to establish that the affiants engaged in a deliberate falsehood or reckless disregard for the truth; rather, the evidence indicates that in their effort to determine the electrical kilowatt usage of the second floor of the building, the affiants were merely innocently mistaken

in their belief that the bill for 151 Main Street included the second floor." The court also concluded that the thermal imaging scan did not constitute a search within the meaning of the federal or state constitutions. The trial court concluded that the affidavit presented sufficient objective indicia of reliability to justify a finding of probable cause and the issuance of a search warrant.

After entering his conditional plea of nolo contendere, the defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). On appeal, the defendant claims that the trial court improperly: (1) determined that a warrantless thermal imaging scan of the defendant's commercial premises did not constitute a search under the federal and state constitutions; (2) concluded that the defendant had failed to establish that the affiants intentionally or recklessly included false information in the affidavit; and (3) concluded that the affidavit presented sufficient facts for a finding of probable cause. We affirm the judgment of conviction.

I

The defendant claims that the trial court incorrectly determined that the warrantless thermal imaging scan of his commercial premises did not constitute a search in violation of his rights under the federal and state constitutions. The state counters that the trial court properly concluded that a thermal imaging scan is not a search and that, even if the trial court was incorrect, there were sufficient other facts in the affidavit to establish probable cause. We agree with the state that there were sufficient other facts in the affidavit to establish probable cause and do not reach the issue of whether the warrantless thermal imaging scan of the defendant's commercial premises constituted a search.

The United States Supreme Court has decided that such a scan of a home is a search requiring a search warrant. In *Kyllo* v. *United States*, 533 U.S. 27, 121 S. Ct. 2038, 2046, 150 L. Ed. 2d 94 (2001), the court held that where a thermal imaging device reveals details of a "private home" that would have been unknowable without a physical intrusion, the surveillance is a fourth amendment search and is presumptively unreasonable without a search warrant.

In *Kyllo*, the court noted that "in assessing when a search is not a search" under the fourth amendment, it had "applied somewhat in reverse the principle" of *Katz* v. *United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). *Kyllo* v. *United States*, supra, 121 S. Ct. 2042. It summarized the *Katz* principle as "whether the individual has an expectation of privacy that society is prepared to recognize as reasonable . . . ." Id., 2043. The court noted that "[i]n the home . . . all details are intimate details because the entire area is held safe from prying government eyes"; id., 2045; and it emphasized that a minimal expectation of privacy exists in a home that is acknowledged to be reasonable. Id., 2043.

The court held in *Kyllo* that "[w]hile it may be difficult to refine *Katz* when the search of areas such as telephone booths, automobiles, or even the curtilage and uncovered portions of residences are at issue, in the case of the search of the interior of homes—the prototypical and hence most commonly litigated area of protected privacy—there is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that *exists*, and that is acknowledged to be *reasonable*. To withdraw protection of this minimum expectation would be to permit police technology to erode the privacy guaranteed by the Fourth Amendment. We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained with-

out physical intrusion into a constitutionally protected area . . . constitutes a search—at least where (as here) the technology in question is not in general public use. This assures preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted. On the basis of this criterion, the information obtained by the thermal imager in this case was the product of a search." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id. The court then remanded the case to the District Court to determine whether, without the evidence resulting from the scan, there was probable cause to support issuance of the search warrant under which evidence was seized from the petitioner's home. Id., 2046.

The *Kyllo* decision did not address the question of whether a search warrant would be required to conduct a thermal imaging scan of premises other than a home, such as a commercial property. The court emphasized, however, the heightened expectation of privacy in one's home and distinguished that heightened expectation from the lesser expectation of privacy in a commercial property. Id., 2045 ("an industrial complex . . . does not share the Fourth Amendment sanctity of the home"); cf. *Dow Chemical Co.* v. *United States*, 476 U.S. 229, 237–38, 106 S. Ct. 1819, 90 L. Ed. 2d 226 (1986) ("the Government has greater latitude to conduct warrantless inspections of commercial property because the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home" [internal quotation marks omitted]). We need not decide that issue because we conclude, as we discuss in part III of this opinion, that even without the results of the thermal imaging scan there were other sufficient facts in the affidavit to establish probable cause.[7]

---

[7] As the United States Supreme Court has noted, there may be exigent circumstances, such as terrorism, that are not related to ordinary crime

## II

The defendant claims that the trial court incorrectly determined that the affiants did not include false information in the affidavit intentionally or with reckless disregard for the truth.

The following additional facts are relevant to the resolution of this claim. In his motion to suppress, the defendant claimed that Hayes intentionally or recklessly had: (1) represented that there was an increase in electricity usage for the building, when the electricity records showing an increase did not include the usage for the second floor; (2) omitted from the affidavit the karate school's class schedule, which indicated that there were no morning classes for children and contradicted the anonymous caller's story;[8] and (3) failed to attempt to verify whether one could peer into the second floor of the building from the rear fire escape, which, the defendant claimed, would have contradicted the anonymous caller's report.[9]

At the *Franks* hearing, Hayes testified that, pursuant to an administrative subpoena, he had obtained electricity records for service at 151 and 153 Main Street. The subpoenaed records did not specify which floors were covered under each address. Hayes stated that he knew from his personal experience that L & M used 151 Main Street as its address and occupied the first and second floors of the building. He also knew that the American Hapkido martial arts school was on the third floor and

control. See *Indianapolis* v. *Edmond*, 531 U.S. 32, 45, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000). This counsels caution in deciding issues regarding the use of sense-enhancing technology such as that involved in the present case.

[8] The caller indicated that he had made his incriminating observations during a break from his child's karate class at approximately noon a few days before he called the police.

[9] The caller stated that he was standing on the rear fire escape stairwell when he looked through the doorway to the second floor and viewed the blue lights and the marijuana plants.

that its address was 153 Main Street. Hayes testified that he believed that the electricity usage for the second floor was reflected in the record for 151 Main Street, and he therefore included that information in the warrant affidavit. The state stipulated at the hearing, however, that the electricity record for 151 Main Street covered only the first floor of the building, not the second floor as represented in the affidavit.

At the hearing, Charles Ehrentraut, the head teacher from the karate school on the third floor of the building, testified that, at the time of the anonymous caller's alleged sighting of the marijuana plants, the school provided only adult classes in the mornings.[10] The defendant also attempted to present testimony from an investigator that, as one walks down the fire escape from the third floor of the building to the second floor, it is impossible to see into the second floor of the building, even if the door to the fire escape is open. The trial court did not admit this testimony at the *Franks* hearing.

In its memorandum of decision, the trial court stated that "the [defendant has] not established by a preponderance of the evidence [his] allegations of perjury or reckless disregard by the affiants. Although the [defendant] demonstrated that the evidence of electrical kilowatt usage obtained by the affiants applied to the wrong floor of the building at 151/153 Main Street, the [defendant has] failed to establish that the affiants engaged in a deliberate falsehood or reckless disregard for the truth; rather, the evidence indicates that in their effort to determine the electrical kilowatt usage of the second floor of the building, the affiants were merely innocently mistaken in their belief that the bill for 151 Main Street included the second floor."

---

[10] It was never established, however, whether the caller's child was participating in karate classes for adults or children.

On appeal, the defendant claims that the trial court improperly concluded that Hayes did not act with intentional or reckless disregard for the truth when he included false information in the affidavit. The state counters that the trial court correctly concluded that Hayes made an innocent mistake with respect to the electricity records. This court rejects a trial court's findings after a *Franks* hearing only if they are clearly erroneous. *State* v. *Stepney*, 191 Conn. 233, 239, 464 A.2d 758, cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). We conclude that the trial court's conclusion that the affiants did not act with intentional or reckless disregard for the truth was not clearly erroneous. The court did find, as the state stipulated, that Hayes had relied on inapplicable electricity records. "It is not enough, however, for the defendant to show an error in an affidavit. The error must be shown by a preponderance of the evidence to have been 'knowingly and intentionally' false or made 'with reckless disregard for the truth.' *Franks* v. *Delaware*, supra, [438 U.S.] 155. 'Allegations of negligence or innocent mistake are insufficient' to require a reevaluation of the affidavit. Id., 171." *State* v. *Stepney*, supra, 239. Given the evidence adduced at the hearing, we conclude that it was not clearly erroneous for the trial court to have found that Hayes innocently was mistaken about which electricity record covered which floor of the building.

Moreover, even if the trial court should have concluded that the statements were intentionally false or made with reckless disregard for the truth, we conclude that other facts existed that were sufficient to sustain a finding of probable cause. This court has stated that if, despite a violation of *Franks* v. *Delaware*, supra, 438 U.S. 154, "the affidavit's remaining content independently establishes probable cause, the warrant is valid and the evidence seized pursuant to it need not be

suppressed." *State* v. *Delmonaco*, 194 Conn. 331, 335, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S. Ct. 511, 83 L. Ed. 2d 401 (1984). We conclude that, even if the electricity records were disregarded, the warrant affidavit provided, as we discuss in part III of this opinion, sufficient probable cause to search the defendant's commercial premises.[11]

The state argues, and we agree, that the claims with respect to the karate class schedule and the visibility of the second floor from the rear fire escape are without merit because, under *Franks*, the truthfulness of the affiant, and not the informant, is the issue. Federal precedent limits the *Franks* challenge to the veracity of the affiant. See *State* v. *Glenn*, 251 Conn. 567, 574–75, 740 A.2d 856 (1999), and cases cited therein. In *Glenn*, we acknowledged that federal precedent in applying our state constitution to *Franks* hearings, and we refused to apply *Franks* to claims that it was the affiant's informant and not the affiant who was untruthful. Id. We see no reason to depart from that holding in this case.

---

[11] The defendant also claims, for the first time on appeal, that the use of the electricity records obtained from Northeast Utilities under a so-called "administrative subpoena" was in effect an illegal, warrantless search and should not have been considered in the probable cause analysis of the warrant affidavit. We conclude that the defendant cannot prevail on this unpreserved claim because he has failed to establish that he has a legitimate expectation of privacy in the records of his electricity usage. See *United States* v. *Miller*, 425 U.S. 435, 442–43, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976) (no fourth amendment interest in financial records kept at bank).

We also reject the defendant's argument that he had a privacy interest in his electricity records protected under General Statutes § 16-262c (e), which provides in relevant part: "No provision of the Freedom of Information Act . . . shall be construed to require or permit a *municipal utility* furnishing electric . . . service . . . to disclose records under the Freedom of Information Act . . . which identify or could lead to identification of the utility usage or billing information of individual customers, to the extent such disclosure would constitute an invasion of privacy." (Emphasis added.) Because there is nothing in the record to establish that Northeast Utilities is a "municipal utility," we conclude that this statutory provision is not applicable to this case.

Accordingly, we reject the defendant's claim concerning the karate class schedule and the visibility of the second floor from the rear fire escape.

### III

The defendant claims that there was insufficient probable cause to search the L & M business premises. We conclude to the contrary that, even without the thermal imaging scan results and the electricity bills, there was probable cause set forth in the affidavit.

A number of federal Circuit Courts of Appeal that have reviewed search warrants that were issued partially based on the basis of the results of thermal imaging scans have found that, even without those results, probable cause was established by other information in the warrant affidavits. See *United States* v. *Cusumano*, 83 F.3d 1247 (10th Cir. 1996) (holding that search warrant was based on probable cause without information supplied by thermal imaging device); *United States* v. *Olson*, 21 F.3d 847 (8th Cir.), cert. denied, 513 U.S. 880, 115 S. Ct. 230, 130 L. Ed. 2d 155 (1994) (finding probable cause to search premises independent of information obtained from thermal imaging device, based in part on reports from anonymous informant); *United States* v. *Feeney*, 984 F.2d 1053 (9th Cir. 1993) (finding probable cause to search home independent of readings from thermal imaging device, based in part on report from anonymous informant). In like manner, we conclude that the information before the issuing judge established probable cause, even if the results of the imaging scan are excluded.[12]

"Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . .

---

[12] The trial court disregarded the electricity usage records, as do we.

Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity; and (2) there is probable cause to believe that the items named will be found in the place to be searched." (Citations omitted; internal quotation marks omitted.) *State* v. *Barton*, 219 Conn. 529, 548, 594 A.2d 917 (1991). In *Barton*, we adopted the totality of the circumstances standard of *Illinois* v. *Gates*, 462 U.S. 213, 233, 103 S. Ct. 2317, 76 L. Ed. 2d 917 (1983), in considering informants' reports for probable cause.

"In determining whether the warrant was based upon probable cause, we may consider only the information that was actually before the issuing judge at the time he or she signed the warrant, and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *McClendon*, 248 Conn. 572, 580, 730 A.2d 1107 (1999); *State* v. *Duntz*, 223 Conn. 207, 216, 613 A.2d 224 (1992).

"If information provided by an unnamed source is believable under the totality of the circumstances test, it may be credited and evaluated along with the other information in the affidavit." *State* v. *Duntz*, supra, 223 Conn. 217. "When hearsay information from third parties is relied on by the affidavit, the 'veracity' or 'reliability' and 'basis of knowledge' of those persons are 'highly relevant' in determining the existence of probable cause." *State* v. *Sivri*, 231 Conn. 115, 146, 646 A.2d 169 (1994). "[S]tatements made by an informant are entitled to greater weight if corroborated by evidence independently gathered by the police." *State* v. *Rodriguez*, 223 Conn. 127, 136, 613 A.2d 211 (1992).

As to the basis of the anonymous caller's knowledge, the affidavit set forth that the anonymous caller personally observed marijuana plants growing on the second floor of the building where L & M was located. The

caller stated that he was on a rear fire escape stairway, taking a cigarette break from his child's third floor karate class, when he noticed the distinctive odor of marijuana, which he recognized from his service in Vietnam. Looking through a partially opened doorway, he saw approximately twenty to twenty-five six foot marijuana plants under tubular purplish lights. The caller also saw two men in the room with the marijuana plants. He described one man as white, heavyset and balding, and the other man as white, with glasses and a ponytail. The caller thought that the two men were affiliated with the L & M business.

As to the reliability of the caller's information, Hayes knew, from his personal experience, that a karate school was located on the third floor of the building. He visited the karate school and confirmed that there was an enclosed fire escape stairway accessible at the rear of the building. Hayes also knew from his personal experience that the caller's descriptions of the two men matched the physical appearance of the defendant and his brother, both of whom Hayes knew operated the L & M home improvement business on the first two floors of the building. Hayes also knew, from a criminal records check, that the defendant had a prior record for a narcotics offense. A suspect's prior criminal record, even if inadmissible at trial, may be the basis for establishing probable cause. See *Brinegar* v. *United States*, 338 U.S. 160, 172–74, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949); *United States* v. *Wagner*, 989 F.2d 69, 73–74 (2d Cir. 1993). Town records indicated that Lida Mordowanec, the mother of the defendant and his brother, owned the building. In addition, Hoyt, who was trained and experienced in indoor marijuana cultivation investigations, confirmed that indoor marijuana cultivation commonly employed 1000 watt grow lights that emit a bluish color.

The caller's report that L & M, a home improvement business, not a florist or a vegetable market, was using high-powered grow lights in midwinter was consistent with marijuana growing. The caller's sighting of those lights inside a home improvement shop in the middle of winter supports a finding of probable cause. In *United States* v. *Cusumano,* supra, 83 F.3d 1248–49, the court found probable cause from the occupant's use of a grow light to grow vegetables in a concealed basement containing an underground swimming pool.

From the information that the caller provided, it was also clear that he was a citizen informer, and, therefore, deserving of credibility. As the affidavit reflects, the caller telephoned the police department and engaged in a conference or three-way conversation with the detective and gave extensive details as to his happening to witness the growing of marijuana at the premises. He also urged the officers to act quickly. "Although anyone who gives information to the police in confidence might be called a 'confidential informant,' the term is usually employed in a more restricted sense to describe a person who is himself in the underworld, so that he is particularly well placed to know its secrets. Courts have properly distinguished between such 'confidential informants' and the average citizen who, as a victim or a witness, happens to have information useful to the police. Such 'citizen informers' are considered more deserving of credibility than are underworld informers, and courts have accordingly tended to examine the basis and sufficiency of a citizen informer's information more closely than his credibility." *State* v. *Barton,* supra, 219 Conn. 542 n.10. We conclude that the affidavit contained facts from which the issuing judge reasonably could have found that the caller spoke from personal knowledge based upon his experience in Vietnam and also reasonably could have concluded that the anonymous caller's information was reliable,

even if the results of the thermal imaging scan and the electricity bills were excluded.

In *Gates* v. *Illinois*, supra, 462 U.S. 213, the informant's identity was unknown, but his report was sufficiently detailed and confirmed by a police investigation to establish probable cause. As in *Gates*, the facts set forth in the affidavit in the present case supported an inference that the informant's report was not the repetition of a "casual rumor" but rather one, as the informant reported, gained by personal, firsthand visual observation. Here, as in *Gates*, the magistrate "could properly conclude that it was not unlikely that [the informant] had access to reliable information of the . . . alleged illegal activities." Id., 245.

Finally, the United States Supreme Court has stated that, "[b]ecause a search warrant provides the detached scrutiny of a neutral magistrate . . . we have expressed a strong preference for warrants and declared that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall. . . . Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination." (Citations omitted; internal quotation marks omitted.) *United States* v. *Leon*, 468 U.S. 897, 913–14, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). We also have stated in *State* v. *Duntz*, supra, 223 Conn. 216, that "[i]n a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the magistrate's determination." (Internal quotation marks omitted.) As the United States Supreme Court has noted, "[a] grudging or negative attitude by reviewing courts toward warrants . . . is inconsistent with the Fourth Amendment's strong preference for

searches conducted pursuant to a warrant; courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner. . . . Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable-cause determination has been that so long as the magistrate had a substantial basis for . . . conclud[ing] that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." (Citations omitted; internal quotation marks omitted.) *Illinois* v. *Gates*, supra, 462 U.S. 236; see also *State* v. *Cobb*, 251 Conn. 285, 317, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 641 (2000); *State* v. *Diaz*, 226 Conn. 514, 535–36, 628 A.2d 567 (1993) (neither Connecticut constitution nor General Statutes § 52-33f requires de novo review of issuing judge's determination that probable cause existed to issue search warrant).

Mindful of the preference for search warrants and the deference to which they are entitled, we uphold the trial court's determination that the motion to suppress should be denied.

The judgment is affirmed.

In this opinion the other justices concurred.