# STATE OF CONNECTICUT *v.* CHAMON CABEZUDO
## (AC 24791)

Lavery, C. J., and Schaller and Dupont, Js.

Argued September 12—officially released November 15, 2005

*Maria A. Cahill,* special public defender, with whom, on the brief, was *Carlos E. Candal,* special public defender, for the appellant (defendant).

*Patrick L. Maurer,* certified legal intern, with whom were *Susann E. Gill,* senior assistant state's attorney, and, on the brief, *Jonathan C. Benedict,* state's attorney, and *Susan F. Filan,* former assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. The defendant, Chamon Cabezudo, appeals from the judgment of conviction rendered following his conditional plea of nolo contendere to one count each of sale of narcotics by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), possession of narcotics with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b) and criminal possession of a weapon in violation of General Statutes § 53a-217. The defendant's sole claim on appeal is that the trial court improperly denied his motion to suppress. We affirm the judgment of the trial court.

On April 17, 2001, the defendant filed a motion to suppress all evidence seized by officers following a search of 36 Wake Street in Bridgeport on August 8, 2000, conducted pursuant to a warrant. His motion alleged that the affidavit offered in support of the warrant failed to establish probable cause. The court conducted a suppression hearing on November 6, 2002, at which the parties stipulated that the salient facts were those contained in the warrant affidavit.[1] By memorandum of decision dated November 13, 2002, the court denied the defendant's motion. The defendant thereafter entered a plea of nolo contendere conditioned on his right to appeal pursuant to General Statutes § 54-

---

[1] No evidence or testimony was presented at the suppression hearing.

94a and Practice Book § 61-6. He was sentenced to a total effective term of fifteen years imprisonment, execution suspended after eight years, with five years probation. This appeal followed.

The question before us is whether the warrant affidavit established probable cause. "A warrant may be issued to search any property at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found." (Internal quotation marks omitted.) *State* v. *Castano*, 25 Conn. App. 99, 100, 592 A.2d 977 (1991). "Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity; and (2) there is probable cause to believe that the items named will be found in the place to be searched." (Internal quotation marks omitted.) *State* v. *Mordowanec*, 259 Conn. 94, 109–10, 788 A.2d 48, cert. denied, 536 U.S. 910, 122 S. Ct. 2369, 153 L. Ed. 2d 189 (2002).

Our determination of whether the affidavit established probable cause is governed by the "totality of the circumstances" test enunciated in *State* v. *Barton*, 219 Conn. 529, 544, 594 A.2d 917 (1991); see also *Illinois* v. *Gates*, 462 U.S. 213, 230–32, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). That test requires the issuing judge to make "a practical, nontechnical decision whether, given all the circumstances set forth in the warrant affidavit, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 223 Conn. 127, 135, 613 A.2d 211 (1992).

In reviewing the sufficiency of an affidavit supporting the application for a search warrant, we will uphold "the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the magistrate's conclusion that probable cause existed." (Internal quotation marks omitted.) *State* v. *Lasaga*, 269 Conn. 454, 469, 848 A.2d 1149 (2004). We do not conduct a de novo review. See *State* v. *Diaz*, 226 Conn. 514, 524, 628 A.2d 567 (1993) (neither Connecticut constitution nor General Statutes § 52-33f requires de novo review of issuing judge's determination that probable cause existed to issue search warrant). Furthermore, "[i]n a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the [court's] determination." *State* v. *Johnson*, 219 Conn. 557, 565, 594 A.2d 933 (1991); see also *State* v. *Velez*, 215 Conn. 667, 673, 577 A.2d 1043 (1990) (reviewing court should pay great deference to trial court's determination regarding existence of probable cause). At the same time, because the validity of the search in the present case implicates the defendant's constitutional rights, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. See *State* v. *Reynolds*, 264 Conn. 1, 43, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). With those principles in mind, we turn to whether there was a substantial factual basis for the issuing judge's conclusion that the affidavit established probable cause.

The warrant affidavit disclosed, inter alia, the following facts. The affiants, Trooper Virgil Procaccini of the state police and Officer Miguel Perez of the Bridgeport police department, were both assigned to the statewide narcotics task force. In June, 2000, the affiants "received information from a confidential informant . . . that a dark skinned male known as 'Shine' . . .

was selling large amounts of Crack-Cocaine and Heroin to drug customers throughout Bridgeport. The [informant] continued to state that 'Shine' has a cousin known as 'Mel' . . . who delivers drugs to 'Shine's' drug customers when 'Shine' is not available. The [informant] stated that drug customers page 'Shine' . . . and arrange to buy drugs . . . . The [informant] stated that all of the . . . information is known of his own personal knowledge and that [he had] bought drugs from 'Shine' and 'Mel' as recently as . . . June 2000. The [informant] has provided information in the past which has been corroborated and found to be truthful and accurate and which has directly resulted in the execution of numerous Search [and] Seizure Warrants resulting in the seizure of Heroin, Crack-Cocaine and powder Cocaine and the arrest and conviction of numerous drug dealers."

The affidavit proceeded to describe seven different occasions on which the affiants observed narcotics transactions between the informant and either Shine or Mel. The transactions all followed similar protocol. For example, during the week ending June 10, 2000, "the affiants met with [the informant] in . . . Bridgeport. The [informant] and [his] vehicle were searched for any mon[eys] or drugs and none were found. The [informant] contacted [a] beeper [number] and awaited a return call. Several minutes later the [informant] received a return call from 'Mel' and the [informant] arranged to buy a quantity of Crack-Cocaine and to meet at a prearranged location in Bridgeport in a short time. The [informant] was provided with an amount of Task Force funds and was followed directly to the meet location while kept under constant surveillance. A short time later, surveillance at the meet location observed a [vehicle] arrive . . . . The [informant] was observed sitting inside the vehicle for a few moments before exiting from the vehicle. Following the transaction, the

[informant] was followed to a prearranged location and met with police. . . . The [informant] handed over a quantity of a packaged white granular substance purported to be Crack-Cocaine. The [informant] stated that 'Mel' arrived . . . and that the [informant] sat inside the car at which time 'Mel' handed the [informant] the Crack-Cocaine in exchange for a quantity of [task force] funds. The [informant] and [his] vehicle were again searched for [any more] drugs or mon[eys] and none were found. . . . [A] portion of the white granular substance was field tested . . . which indicated a positive reaction for the presumptive presence of [cocaine]."

Six such transactions followed during June and July, 2000, two of which involved Mel and four of which involved Shine. Each time, the substances purchased tested positive for either cocaine or heroin.

Following a transaction at a prearranged location during the week of June 24, 2000, surveillance of the vehicle operated by Shine continued and the affiants "coordinated with [a] uniformed Bridgeport [p]olice [o]fficer . . . to stop the vehicle and identify the operator. The operator known as 'Shine' was identified with a [Connecticut] photo driver['s] license as [the defendant] . . . ." Procaccini subsequently met with a parole officer in the Bridgeport office of adult parole, who advised that the defendant was currently on parole from a previous narcotics conviction. The parole officer also informed Procaccini that the defendant was living with his mother at 114 Division Street in Bridgeport and that the defendant "has a sister . . . living at 36 Wake Street . . . where [the defendant] . . . told [the parole officer that] he spends [a lot] of time during the day."

The last two transactions involving the informant and the defendant are significant in that, unlike the five previous transactions, surveillance was established at 36 Wake Street prior to initiation of the transactions.

On those two occasions, the informant contacted the beeper number and received a return call from the defendant, who agreed to meet the informant at a prearranged location. Under surveillance, the defendant then was observed exiting 36 Wake Street and departing in a vehicle that surveillance officers followed directly to the "meet location," where the transactions transpired. Both times, the defendant's vehicle immediately returned to 36 Wake Street, where the defendant entered the residence.[2]

In addition, the affiants stated that they "know based on police training and experience that drug traffickers involved in narcotics, store drugs and weapons, drug packaging materials, cutting agents, scales . . . and other paraphernalia necessary to facilitate drug transactions at their own residence and the apartments of . . . family members and that they will also commonly store mon[eys] . . . . Further that weapons [and] ammunition . . . are used by narcotics traffickers to facilitate their narcotics operations." The affiants concluded that "based on training and experience and the facts contained in this affidavit . . . the apartment and basement located at . . . 36 Wake Street in Bridgeport . . . is presently and continuously being used to violate [§§ 21a-278 (b) and 21a-279 (a)]."[3]

In his brief, the defendant contends that *State* v. *DeChamplain*, 179 Conn. 522, 427 A.2d 1338 (1980), is dispositive of the present appeal. *DeChamplain*

[2] The affidavit also indicated that the defendant utilized three different vehicles during the four transactions in which he participated directly.

[3] At the August 8, 2000 search of 36 Wake Street, authorities recovered, inter alia, varying amounts of crack cocaine, powder cocaine and heroin; two scales; a box of single edge blades; a plate with residue; a spoon with residue; 194 glassine envelopes; four plastic bags containing rubber bands; a box of firearm ammunition containing thirty-nine live cartridges; a crossbow and BB gun; a safe; and more than $10,000 cash.

involved a search and seizure at apartment 7A at the Jedholme apartment complex in Lisbon. "In *DeChamplain*, the court found a lack of probable cause to believe that drugs were located in the defendant's apartment, because the only [fact] establishing a nexus to the apartment was a single telephone call to the defendant at his apartment in which he received an order for the purchase of drugs." *State* v. *Brown*, 14 Conn. App. 605, 619, 543 A.2d 750, cert. denied, 208 Conn. 816, 546 A.2d 283 (1988).

The present case is readily distinguishable from *DeChamplain*. Whereas *DeChamplain* involved a one time sale of narcotics, the affiants here observed seven separate narcotics transactions over the course of two months. Moreover, surveillance officers twice observed the defendant exit 36 Wake Street, travel directly to a prearranged meeting place with the informant and then immediately return to 36 Wake Street. That is in stark contrast to *DeChamplain*, in which "there was no indication in the affidavit that anyone saw [the defendant] leave apartment 7A . . . ." *State* v. *DeChamplain*, supra, 179 Conn. 532. Furthermore, the *DeChamplain* court noted that, as the subject property in *DeChamplain* was but one of several apartments in the complex, it was just as likely that the narcotics sought to be seized were in another apartment in the complex. Id. The subject property here, however, was both specifically described[4] and plainly visible to surveillance officers. Although it is conceivable that the narcotics were stored in the vehicle driven by the defendant prior to each meeting with the informant, the affidavit's indication that three different vehicles were utilized in the

[4] The warrant authorized a search and seizure of "[t]he apartment and basement located at . . . 36 Wake Street in Bridgeport . . . described as a 2-story, duplex style dwelling, white in color with black shutters and two front doors of which the front/right door is marked #36 and the front/left is marked #38."

four transactions involving the defendant militates against that possibility.

It is undisputed that the affidavit contains no indication of firsthand observation that narcotics were present inside 36 Wake Street. Connecticut law, however, contains no such requirement. "Actual observations of illegal activity or contraband in the premises to be searched . . . are not required to establish probable cause. . . . The nexus between the premises and the evidence can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [the evidence]." (Citation omitted; internal quotation marks omitted.) *State* v. *Castano*, supra, 25 Conn. App. 103–104.

As *DeChamplain* instructs, "[w]hether a search is unreasonable . . . depends upon the facts and circumstances of each case." *State* v. *DeChamplain*, supra, 179 Conn. 531. The affidavit in the present case detailed an investigation of the statewide narcotics task force conducted over the course of months. Seven narcotics transactions were observed, four of which directly involved the defendant. Each time, the substance purchased by the informant tested positive for either cocaine or heroin. Twice the defendant was observed departing 36 Wake Street, meeting with the informant and immediately returning to 36 Wake Street without interruption. Moreover, the affiants learned from the defendant's parole officer that the defendant had been spending significant amounts of time at 36 Wake Street.

Our Supreme Court has defined probable cause as a "fair probability that contraband or evidence of a crime will be found in a particular place." (Internal quotation marks omitted.) *State* v. *Rodriguez*, supra, 223 Conn. 135. Given the totality of the circumstances set forth in the warrant affidavit, we conclude that the issuing

judge had a substantial factual basis on which to conclude that probable cause existed. Therefore, the court properly denied the motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.