STATE OF CONNECTICUT *v.* GEOFFREY
K. FERGUSON
(SC 15964)

Sullivan, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued February 14—officially released May 28, 2002

*Lauren Weisfeld*, assistant public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom were *Walter D. Flanagan*, state's attorney, and, on the brief, *Patricia M. Froehlich*, state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Geoffrey K. Ferguson, following a jury trial, was convicted of five counts of murder in violation of General Statutes § 53a-54a (a),[1] two counts of capital felony in violation of General Statutes § 53a-54b (8),[2] one count of arson in the first degree in violation of General Statutes § 53a-111 (a) (1),[3] and one count of arson in the second degree in violation of General Statutes § 53a-112 (a) (1) (B).[4] The trial court, *Nigro, J.*, merged the predicate murder convictions into their respective capital felony convictions and imposed two concurrent sentences of life imprisonment without the possibility of release.[5] The court also

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (8) murder of two or more persons at the same time or in the course of a single transaction . . . ."

[3] General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . ."

[4] General Statutes § 53a-112 (a) provides in relevant part: "A person is guilty of arson in the second degree when, with intent to destroy or damage a building, as defined in section 53a-100, (1) he starts a fire or causes an explosion and . . . (B) such fire or explosion was intended to conceal some other criminal act . . . ."

[5] The state did not seek the death penalty because, it asserted, it could not establish an aggravating factor. See General Statutes § 53a-46a.

imposed a sentence of twenty-five years imprisonment for the crime of first degree arson, to run concurrently with one of the capital felony convictions, and twenty years imprisonment for the crime of second degree arson, to run concurrently with the other capital felony conviction. On appeal, the defendant raises six challenges to the validity of his convictions. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant owned property at 166 Portland Avenue in the Georgetown section of Redding, Connecticut. Located on this property was a single-family residence that the defendant had enlarged and converted into three apartments. The first floor of the building consisted of two apartments with the entirety of the second floor serving as the third apartment. A two-story glass atrium was attached to one side of the building and a spiral stairway inside the atrium provided access to the apartment from the ground. In April, 1995, the second floor apartment was occupied by Scott Auerbach, David Froehlich and Jason Trusewicz. Laureen Spear and her five year old son lived in the front first floor apartment, and the rear first floor apartment was occupied by Freddi Altamirano, an immigrant from Costa Rica. Altamirano lived with three other men in this apartment. The defendant served as the tenants' landlord, but he resided in Powell's Point, North Carolina.

In March, 1995, the upstairs tenants were late paying their rent to the defendant. The defendant asked a friend, Christopher Given, to attempt to collect the rent from the upstairs tenants. The tenants told Given that the rent would be forthcoming and Given relayed this information to the defendant. The defendant was dissatisfied with this arrangement and shortly thereafter informed Given that the defendant was going to evict these tenants.

On March 29, 1995, the defendant drove from North Carolina to Connecticut. He entered the upstairs apartment. The defendant then removed the upstairs tenants' belongings and placed some of them in the glass atrium and others outside the building. Altamirano helped the defendant carry out one of the upstairs beds. In addition to removing the tenants' clothing, furniture and other belongings, the defendant also removed the toilet and the thermostat. The defendant then nailed a large piece of plywood over the entrance to the apartment.

Later that day, the tenants returned to their apartment. They called the police and reported that they had been locked out of the apartment. The police conducted an investigation to determine whether the defendant had lawfully evicted the tenants. The police concluded that the tenants had the right to reenter the apartment because the defendant had not properly evicted the tenants. After receiving this information from the police, the tenants reentered the apartment by pulling off the plywood barrier.

As a result of the lockout, two of the tenants instituted small claims actions against the defendant. Redding officials also notified the defendant of several possible building code violations. The defendant was also ordered to appear before the Redding conservation commission on April 18, 1995, to respond to an alleged environmental violation on the property. The Redding fire marshal also informed the defendant of several possible fire code violations at the building. Finally, on April 17, 1995, a member of the Redding police department applied for an arrest warrant charging the defendant with criminal lock out.

That same day, the defendant rented a champagne colored Ford Tempo from U-Save Auto Rental in Harbinger, North Carolina. The defendant told the rental agent that he would be using the car to visit his wife

in South Carolina. The defendant removed the U-Save Auto Rental license plate from the front of the car.

The defendant left the rental agency at approximately 4:15 p.m. on April 17, and traveled north to Connecticut. At approximately 12:20 p.m. the next day, Spear left her first floor apartment and walked to the end of the driveway to get her mail. From the end of the driveway, Spear spotted the defendant driving the rental car. When Spear saw the defendant, he was turning the car into a synagogue parking lot that abutted his property. At the last moment, however, the defendant returned to his lane of travel and proceeded straight along the road. As the car drove past her, the defendant turned his head away from her so that Spear was able to see only the back of his head and his grey ponytail. Spear also noted a North Carolina license plate on the rear of the car. Later that afternoon, the defendant parked the rental car in the synagogue parking lot. The car was parked with the tailgate against a wall that separated the synagogue from the defendant's property, effectively hiding from view the car's North Carolina license plate.

Around 4 p.m., Altamirano was in his apartment watching television. The screen went blank. Altamirano adjusted the cable box, but he could not correct the problem because the defendant had cut the cable and telephone lines to the building. At several points and through various windows of his apartment, Altamirano observed the defendant walking outside the building. Altamirano had a clear view of the defendant. At one point, as Altamirano watched through a window in his bathroom, he saw the defendant from a distance of only a few feet as the defendant bent down at an oil tank pipe coming out of the ground at the base of the building. Altamirano knew who the defendant was because they had met on two prior occasions: first, when Altamirano had placed a deposit on the apartment, and second, as noted previously, when Altamirano helped the defen-

dant remove some of the upstairs tenants' belongings. A ladder was placed beside one of Altamirano's windows and provided access to the roof over his apartment. From the roof area, entry to the second floor apartment could be obtained through a sliding glass door.

The defendant entered the second floor apartment through the sliding glass door. Once inside the apartment, the defendant shot Froehlich and David Gartrell. Froehlich was shot twice and Gartrell was shot three times. All gunshots were to the head. Altamirano heard the gunshots, as did two neighbors. The defendant then placed both bodies in the bathroom, laying Gartrell's body on top of Froehlich's.

Auerbach, Trusewicz and Sean Hiltunen all worked in Stamford. They left work on April 18, 1995, at some point between 5 p.m. and 5:15 p.m. The travel time between their office in Stamford and the apartment in Redding was approximately thirty-five minutes. The three men entered the apartment and the defendant shot each one. Hiltunen was shot twice, once in the head and once in the neck. Trusewicz was shot once in the head. Auerbach was shot twice in the head.

The defendant poured an accelerant on four of the bodies and set them ablaze. The defendant also used an accelerant to set fires in various areas of the basement and second floor apartment. Neighbors found the fifth victim hanging from the spiral staircase in the glass atrium. He was pulled, still alive, from the burning building, although he later died at the hospital. Each of the victims died as a result of gunshot wounds to the head. The shots were fired from a .22 caliber semiautomatic pistol owned by the defendant. The gun, however, was never recovered.

After killing the victims and setting fire to their bodies and the building, the defendant left the scene and drove

south. The defendant stopped in Elizabeth City, North Carolina, where he called his father-in-law in Hilton Head, South Carolina. The defendant continued on to his father-in-law's condominium, arriving there late in the afternoon on the day following the murders. After a brief visit, he spent the night at a motel in Wade, North Carolina. He returned the Ford Tempo to U-Save Auto Rental in Harbinger, North Carolina on April 20, 1995. After backing the car into a space at the rental lot, the defendant reinstalled the U-Save license plate on the front of the car. Over the three day rental period, the defendant had driven 1929 miles in the car. Forensic tests of a piece of a victim's charred clothing and of a floor mat in the rental car indicated that both had been exposed to the same type of petroleum based accelerant. Additional facts will be stated as necessary.

The defendant makes six claims on appeal. He contends that the trial court improperly: (1) precluded the cross-examination of a prosecution witness in violation of the defendant's right to confront a witness pursuant to both the sixth amendment[6] to the United States constitution and article first, § 8, of the constitution of Connecticut,[7] as well as interfered with the defendant's right to present a defense pursuant to the sixth amendment to the United States constitution; (2) admitted testimony regarding prior threats made by the defendant against former tenants; (3) violated the defendant's double jeopardy rights by convicting him of two separate capital felonies; (4) denied the defendant's request to hold a hearing, pursuant to *Franks* v. *Delaware*, 438

[6] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor . . . ."

[7] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him; [and] to have compulsory process to obtain witnesses in his behalf . . . ."

U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), to determine whether probable cause existed for the issuance of a warrant to search the defendant's home, vehicle and person in North Carolina; (5) denied the defendant a fair jury array; and (6) instructed the jury on reasonable doubt. We address each of these contentions in turn.

I

CROSS-EXAMINATION AND RIGHT
TO PRESENT A DEFENSE

The defendant contends that the trial court improperly denied him his right to cross-examine a witness for the state, and his right to present a defense by excluding photographic evidence.[8] The defendant sought to use the excluded evidence to: (1) impeach Altamirano, the state's primary identification witness; and (2) provide a third party culprit defense. The following additional facts are necessary for a resolution of this claim.

Altamirano gave a statement to the police the day after the crime. In the statement, Altamirano identified the defendant as the person he had seen walking outside the building on the day of the murders. He said he knew it was the defendant because he had met him before. As noted previously, the defendant was Altamirano's landlord.

On August 7, 1996, the police again met with Altamirano and they asked him to describe what the defendant had been wearing on the day of the murders. Altamirano

---

[8] The defendant invoked both the federal constitution and the constitution of Connecticut. "[H]e [however] has proffered no argument that the rights afforded to him by the federal and the state constitutions are in any way distinguishable with respect to the substantive issue that he has raised. We see no reason, on the facts of this case, independently to undertake such an analysis." (Internal quotation marks omitted.) State v. Birch, 219 Conn. 743, 746 n.4, 594 A.2d 972 (1991).

stated that the defendant was wearing a "long sleeve coffee colored T-shirt, dark jeans, and a dark colored baseball cap." The police then showed Altamirano a photograph of a man with similar physical characteristics as the defendant. The photograph was produced from security camera videotape taken at a Mobil gas station a short distance from the crime scene. The videotape was shot shortly after 6 p.m. on the day of the crime. The black and white photograph depicted a man with a ponytail, wearing a dark baseball cap, a long sleeve T-shirt and dark pants. The man in the photograph is seen from the side so his face is hidden from view. Because the photograph was produced from security camera videotape, the quality of the photograph was poor.

After showing Altamirano the Mobil photograph, the police asked him if the individual in the photograph was wearing clothing similar to the defendant on the date of the murders. In a statement given to the police (1996 statement), Altamirano agreed that there were similarities, but indicated that he could not say for certain that the individual in the photograph was the defendant because the picture was poor in quality and the individual was pictured from the side.[9] A later portion

---

[9] Altamirano described the individual in the photograph as follows: "I noticed the individual was wearing a dark colored baseball hat similar to the one that [the defendant] was wearing on 04-18-95, the date of the fire. I also noticed the individual wearing a long sleeved, dark colored T-shirt. This shirt was similar in style and type as the shirt that [the defendant] was wearing when I saw him on the day of the fire. This individual was also wearing dark colored jeans similar to the dark colored jeans that [the defendant] was wearing on 04-18-95. I also noticed that the individual in the photograph was wearing light colored work boots. I cannot be sure that these were the same or similar [footwear] that [the defendant] was wearing on 04-18-95, because I did not take notice of the type of [footwear] he was wearing on 04-18-95. I noticed that the individual in the photograph did have his hair tied back in a ponytail similar to the hair style that [the defendant] had the day I saw him on 04-18-95. I also noticed that the individual in the photograph has his shirt tucked into his pants in a similar fashion to [how] I recall [the defendant] was wearing his shirt on the day I saw him on 04-18-95. Through my observation of this photograph I cannot say for certain

of the Mobil videotape revealed, however, that the same individual was at the gas station on April 19, 1995, at 3 p.m. As the parties agree, because the defendant was traveling by car to his father-in-law's condominium at that time, the man in the Mobil photograph could not have been the defendant.

During the trial, the defendant attempted at several points to have the Mobil photograph admitted into evidence. The defendant first tried to introduce the Mobil photograph through his cross-examination of Altamirano and, thereafter, upon recalling Altamirano during the defendant's case-in-chief. The state objected to the photograph's admission on relevancy grounds. The trial court permitted the defendant to make several offers of proof concerning the photograph. The defendant based his argument for admissibility of the Mobil photograph on essentially three grounds. First, the defendant claimed that Altamirano, by viewing the photograph, was able to make an enhanced identification of the defendant. This additional detail, the defendant claimed, was inconsistent with Altamirano's earlier identification of the defendant and he had a right to explore this inconsistency on cross-examination of Altamirano by introducing the photograph. Second, because he was an illegal alien, Altamirano had an interest in testifying in a manner favorable to the state. Altamirano, therefore, was likely to acquiesce to any of the state's requests concerning the identification and the defendant sought to use the Mobil photograph to cross-examine Altamirano with respect to his interest and bias as a witness for the state. Third, the Mobil photograph would be used to establish a third party culpability defense. The state contends that the trial

that the individual is [the defendant]. However, the individual has similar clothing characteristics to [the defendant]. The reason I cannot be certain the individual is [the defendant] is because I cannot see the individual's face and the poor quality of the photograph."

court appropriately excluded the Mobil photograph and, in doing so, did not interfere with the defendant's right of confrontation nor his right to present a defense. We agree with the state.

"Our analysis of the defendant's claim begins with the axiom that the defendant is entitled to confront and cross-examine fairly and fully the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Pratt*, 235 Conn. 595, 603–604, 669 A.2d 562 (1995). "In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Santiago*, 224 Conn. 325, 331, 618 A.2d 32 (1992). "Impeachment of a witness for motive, bias and interest may also be accomplished by the introduction of extrinsic evidence. . . . The same rule that applies to the right to cross-examine applies with respect to extrinsic evidence to show motive, bias and interest . . . ." (Citations omitted.) *State* v. *Colton*, 227 Conn. 231, 249, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert.

denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996).

"The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." *State* v. *Barnes*, 232 Conn. 740, 746–47, 657 A.2d 611 (1995). Furthermore, "[t]o establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Internal quotation marks omitted.) *State* v. *Castro*, 196 Conn. 421, 426, 493 A.2d 223 (1985). "The proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant." (Internal quotation marks omitted.) *State* v. *Barnes*, supra, 747. "When the trial court excludes defense evidence that provides the defendant with a basis for cross-examination of the state's witnesses, however, such exclusion may give rise to a claim of denial of the right to confrontation and to present a defense." *State* v. *Casanova*, 255 Conn. 581, 592, 767 A.2d 1189 (2001). With these principles in mind, we turn to the defendant's contentions.

We first examine whether exclusion of the Mobil photograph impermissibly interfered with the defendant's right of confrontation. We do so, mindful of the trial court's "duty . . . to exclude irrelevant evidence. . . . The confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination." (Citations omitted; internal quotation marks omitted.) *State* v. *Pratt*, supra, 235 Conn. 604–605. After careful review of the record, we conclude that the defendant's right of confrontation was not violated

because the trial court appropriately excluded the Mobil photograph as irrelevant evidence.

As noted, the defendant first argued for admission of the Mobil photograph on the basis that it would assist him in revealing an inconsistency with Altamirano's testimony on direct examination. Like the trial court, we are unconvinced that the Mobil photograph revealed any inconsistencies with Altamirano's testimony on direct examination.[10] In the state's direct examination of Altamirano, he was never asked to describe what the defendant was wearing on the day of the murders or to discuss any photographic identification of the defendant or anyone else. Instead, Altamirano testified to seeing the defendant at the scene. Altamirano was capable of providing this identification because *he knew* the defendant, *not* because the defendant's clothing on the day of the murders had served as a touchstone for Altamirano's in-court identification.

We also conclude that exclusion of the photograph did not interfere with the defendant's attempt to cross-examine Altamirano concerning interest and bias. The theme of the defendant's cross-examination on this issue is that because of Altamirano's status as an illegal immigrant, he was beholden to the state and would testify to whatever the state asked of him. When determining whether cross-examination was improperly restricted, a reviewing court should examine the entire cross-examination. *State* v. *Valentine*, 240 Conn. 395, 407, 692 A.2d 727 (1997). The defendant had ample opportunity to examine Altamirano's potential bias and interest as a witness. Specifically, the jury learned that Altamirano was an illegal alien who came to the United

---

[10] If the defendant sought to impeach Altamirano by introducing a prior inconsistent statement, then he should have moved for admission of his 1996 statement, which was given to police after he had viewed the Mobil photograph. The defendant, however, sought to have only the photograph admitted, not the 1996 statement.

States to work and that his tourist visa to visit the United States had expired in November, 1994. The jury also learned that detectives successfully had requested that Altamirano not be deported so that he could testify in the case against the defendant. On the basis of the record before us, we cannot conclude that exclusion of the Mobil photograph improperly interfered with the defendant's right to cross-examine as to interest and bias. See id., 410. Accordingly, we conclude that the trial court did not abuse its discretion when it prohibited the defendant from using the Mobil photograph during its cross-examination of Altamirano.

We conclude, further, that the defendant's right of confrontation was not violated when the trial court refused to admit the Mobil photograph during the defendant's examination of Altamirano in its case-in-chief. Although a party may impeach his own witness; *State v. Graham*, 200 Conn. 9, 17, 509 A.2d 493 (1986); the trial court must still ascertain whether the evidence sought to be used to impeach the witness is relevant. Our careful review of the record indicates that the defendant failed to establish how the Mobil photograph was relevant. The important point to recall with reference to the Mobil photograph is that when he met with police in August, 1996, Altamirano never identified the individual in the photograph as being the defendant. In fact, he articulated his inability, based on the photograph's poor quality and the side angle view of the subject, to state that this person was the defendant. Obviously, if Altamirano *had* identified the man in the Mobil photograph as being the defendant, then it would have been a proper line of inquiry to challenge Altamirano's ability to differentiate between the defendant and a photograph of a person that all parties agreed was not the defendant. This, however, was not the case. We also conclude that presentation of the Mobil photograph to the jury likely would have led to confusion.

Consequently, the trial court did not abuse its discretion in excluding the photograph.[11]

The defendant also contends that the trial court improperly interfered with his constitutional right to present a defense when it excluded the Mobil photograph. On appeal, the defendant argues that he sought to use the Mobil photograph to present a defense of third party culpability. For the reasons that follow, we conclude that it was not an abuse of discretion for the trial court to preclude the defendant from using the photograph for this purpose.

"Both this state and other jurisdictions have recognized that a defendant may introduce evidence which indicates that a third party, and not the defendant, committed the crime with which the defendant is charged. . . . The defendant, however, must show some evidence which directly connects a third party to the crime with which the defendant is charged. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 564, 747 A.2d 487 (2000).

We first note that, with regard to the Mobil photograph, the defendant attempts to present a third party culpability defense on appeal that it largely disavowed during the trial. In an offer of proof regarding the Mobil photograph, the defendant's attorney stated: "What we're trying to establish here is that—not that [the Mobil person] committed the crime because this is probably

---

[11] We agree with the trial court's statement in its oral ruling excluding the Mobil photograph: "[All] it's going to do is raise speculation on the part of the jury. It will not, [be] of any benefit in impeaching the testimony of [Altamirano] since he refused to identify or did not identify rather, the pictures of a person who was not the defendant, as the defendant."

just some innocent customer that goes back and forth. What I'm trying to establish is that Mr. Altamirano's identification cannot be trusted, that Mr. Altamirano will do whatever the state wants him to do." On appeal, the defendant claims that exclusion of the Mobil photograph interfered with his right to present a third party culpability defense. We disagree.

Without more, the Mobil photograph is insufficient evidence upon which to base a third party defense. In essence, this is a blurry photograph, taken around the time of the fire, of an unknown third party. If the defendant seriously sought to utilize this defense strategy through use of the Mobil photograph, then he should have adduced other evidence to be used for this purpose. The defendant presented no other evidence, however, linking the individual at the Mobil station to the crime scene. "Ordinarily, evidence concerning a third party's involvement is not admissible until there is some evidence which directly connects that third party with the crime. . . . Unless that direct connection exists it is within the sound discretion of the trial court to refuse to admit such evidence when it simply affords a possible ground of possible suspicion against another person." (Citation omitted; internal quotation marks omitted.) *State* v. *Boles*, 223 Conn. 535, 549–50, 613 A.2d 770 (1992). The trial court properly determined that the photograph, standing alone, was insufficient to constitute a basis for the defense of third party culpability.

For the foregoing reasons, we conclude that the defendant's right of confrontation and right to present a defense were not violated by the trial court's exclusion of the Mobil photograph.

## II

## ADMISSION OF THE DEFENDANT'S PRIOR THREATS

The defendant contends that the trial court improperly admitted testimony from two of his former tenants

concerning threats made by the defendant to harm them if they attempted to assert their legal rights against him.[12] The following additional facts are relevant to our resolution of this claim.

In 1991, Richard Barry Marshall was a tenant of the defendant. At one point, after Marshall had been late paying the rent, the defendant came to the apartment and demanded payment. Marshall told the defendant that he had certain rights as a tenant, including the right to make payment up until the tenth of each month. Marshall also told the defendant that if the defendant locked him out of the apartment, Marshall had the right to reenter it. According to Marshall, the defendant responded, " 'Well, if you move back in, I'll break your fucking legs.' " Marshall then left Redding for a few days and came back to the apartment to find that his belongings had been removed to the porch area. The defendant also had changed the locks. When Marshall informed the defendant that he was going to call the police for assistance in gaining reentry, the defendant told him, " 'Call the cops. I'll get my gun and go out in a blaze of glory.' " Marshall never reentered the apartment.

In 1993, Troy Harvey was a tenant of the defendant. In July of that year, Harvey was late paying rent. He received a call from the defendant demanding payment by the next day. The defendant also told Harvey that if payment were not made, the defendant would remove all of Harvey's belongings and board up the house. Harvey told the defendant that he had certain rights as a tenant and that if the defendant carried out his threat to evict Harvey from the apartment, he would ask the

---

[12] At trial, both the state and the defendant addressed the issue of the defendant's prior threats as an issue of uncharged misconduct. The trial court, without determining whether the threats constituted uncharged misconduct, admitted the testimony because it deemed the threats to be admissions. For the reasons set forth hereafter, we agree with the trial court.

police for assistance in reentering. The defendant told Harvey that if he did that, the defendant would " 'blow [Harvey's] head off with a shotgun.' " Harvey sent his rental payment to the defendant by express delivery the next day.

As this is a claim of an evidentiary error, the trial court's ruling will be reversed only upon a showing of clear abuse of the court's discretion. See, e.g., *State* v. *Matos*, 240 Conn. 743, 764, 694 A.2d 775 (1997). Furthermore, in the case of evidentiary error, the defendant bears the burden of proving harm. See, e.g., *State* v. *Torres*, 210 Conn. 631, 642, 556 A.2d 1013 (1989). "The defendant must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Payne*, 219 Conn. 93, 102–103, 591 A.2d 1246 (1991). We conclude that the trial court properly admitted the defendant's statements because they constitute admissions and, therefore, they constitute an exception to the rule against hearsay. Further, as admissions, the defendant's threats to physically harm his prior tenants if they asserted their rights are relevant to the defendant's motive to commit the crimes in the present case.

It is an "elementary rule of evidence that an admission of a party may be entered into evidence as an exception to the hearsay rule." *Fico* v. *Liquor Control Commission*, 168 Conn. 74, 77, 358 A.2d 353 (1975); Conn. Code Evid. § 8-3 (1). In the criminal context, an admission "is the avowal or acknowledgment of a fact or of circumstances from which guilt *may* be inferred, and only *tending* to prove the offense charged, but not amounting to a confession of guilt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Stepney*, 191 Conn. 233, 250, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). "[S]tatements made out of court by a party-

opponent are universally deemed admissible when offered against him; 4 Wigmore, Evidence (Chadbourn Rev. 1972) § 1048, p. 2; so long as they are relevant and material to issues in the case. *State* v. *Stepney*, supra, 251. [T]he vast weight of authority, judicial, legislative, and scholarly, supports the admissibility without restriction of any statement of a party offered against that party at trial." (Internal quotation marks omitted.) *State* v. *Woodson*, 227 Conn. 1, 15, 629 A.2d 386 (1993).

In *State* v. *Woodson*, supra, 227 Conn. 15–16, we concluded that a defendant's earlier threat qualified as an admission, even when the prior threat concerned a different event than the crime for which the defendant is being prosecuted, so long as the threat was relevant to an issue in the case. In *Woodson*, the defendant was charged with arson and insurance fraud and the trial court permitted the state to introduce a threat by the defendant on an earlier occasion, to burn a different property. Id., 13. We concluded that the trial court had not abused its discretion in allowing the state to introduce evidence of this threat as an admission. Id., 15. Even though the threat, in the context in which it was made, was not an admission to the *specific* crime of which the defendant was being tried, the threat, nevertheless, was relevant because it served to establish the defendant's state of mind at the time he was alleged to have committed the crimes for which he was being tried. Id., 16.

In the present case, the defendant's prior threats to Marshall and Harvey are admissions because they constitute facts that, if accepted by the jury, are relevant to the defendant's state of mind at the time he was alleged to have committed murder. Whereas Marshall and Harvey heard the threats and took no action against the defendant, the victims in this case challenged the defendant by reentering the apartment and by instituting legal proceedings against him. The defendant, there-

fore, had a motive to harm these victims that was otherwise lacking in his interactions with Marshall and Harvey. As evidence of this motive, it was proper to admit the defendant's pledges to inflict violence on prior tenants who challenged him. The threats are clearly an admission, that is, "the avowal or acknowledgment of a fact or of circumstances from which guilt *may* be inferred, and only tending to prove the offense charged . . . ." (Emphasis in original; internal quotation marks omitted.) *State* v. *Stepney*, supra, 191 Conn. 250.

Relevant evidence is excluded, however, when its probative value is outweighed by the danger of unfair prejudice. *State* v. *Rinaldi*, 220 Conn. 345, 356, 599 A.2d 1 (1991); Conn. Code Evid. § 4-3. "[T]he determination of whether the prejudicial impact of evidence outweighs its probative value is left to the sound discretion of the trial court judge and is subject to reversal only where an abuse of discretion is manifest or injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Rinaldi*, supra, 355. Of course, "[a]ll evidence is adverse to some party and thus prejudicial to that party's case, but . . . [evidence] damaging to one's case is inadmissible only if it creates 'undue' prejudice so that it threatens an injustice were it to be admitted." C. Tait, Connecticut Evidence (3d Ed. 2001) § 4.8, pp. 208–209.

We have established that there are four situations wherein the potential for prejudice suggests the exclusion of otherwise relevant evidence. "These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and

unprepared to meet it." *State* v. *DeMatteo*, 186 Conn. 696, 702–703, 443 A.2d 915 (1982). The trial court appropriately engaged in an analysis of whether presentation of this evidence to the jury amounted to unfair prejudice and concluded that it did not. We do not consider the trial court's conclusion on this issue to constitute an abuse of discretion and, therefore, we conclude that the trial court properly admitted this relevant evidence.

## III

## DOUBLE JEOPARDY

The defendant contends that his double jeopardy rights were violated by virtue of his conviction of two separate counts of capital felony. We disagree.

The double jeopardy clause of the fifth amendment to the United States constitution provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ." This constitutional provision is applicable to the states through the due process clause of the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). The Connecticut constitution provides coextensive protection, with the federal constitution, against double jeopardy.[13] *State* v. *Kasprzyk*, 255 Conn. 186, 191–92, 763 A.2d 655 (2001). "This constitutional guarantee serves three separate functions: (1) It protects against a second prosecution for the same offense after acquittal. [2] It protects against a second prosecu-

---

[13] Although the Connecticut constitution contains no specific double jeopardy provision, the due process and personal liberty guarantees of article first, §§ 8 and 9, of the Connecticut constitution include protection against double jeopardy. *State* v. *Kasprzyk*, 255 Conn. 186, 192, 763 A.2d 655 (2001).

Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

tion for the same offense after conviction. [3] And it protects against multiple punishments for the same offense [in a single trial]." (Internal quotation marks omitted.) *State* v. *Chicano*, 216 Conn. 699, 706, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). The defendant's claim in this appeal implicates the last of these three functions.

"The double jeopardy analysis in the context of a single trial is a two part process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v. *Kulmac*, 230 Conn. 43, 67, 644 A.2d 887 (1994). "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri* v. *Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983); *Garrett* v. *United States*, 471 U.S. 773, 793, 105 S. Ct. 2407, 85 L. Ed. 2d 764 (1985); *State* v. *Greco*, 216 Conn. 282, 290, 579 A.2d 84 (1990). "[T]he role of the constitutional guarantee [against double jeopardy] is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown* v. *Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977); *State* v. *Greco*, supra, 290. On appeal, the defendant "bears the burden of proving that the prosecutions are for the same offense in law and fact." (Internal quotation marks omitted.) *State* v. *Kulmac*, supra, 67.

Section 53a-54b (8) provides that a person is guilty of capital felony when convicted of the "murder of two or more persons at the same time or in the course of a single transaction . . . ." If the defendant committed two independent sets of multiple murders, with the

multiple murders of each set occurring "at the same time," he can be convicted of two counts of capital felony. To conclude otherwise would be to ignore the statutory mandate that a capital felony can be committed in either one of two ways. *State* v. *Gibbs*, 254 Conn. 578, 602–603, 758 A.2d 327 (2000).

We specifically noted, in *Gibbs*, the two means by which multiple murders could be prosecuted as a capital felony: first, if the murders took place at the same time, and second, if the murders took place in the course of a single transaction. General Statutes § 53a-54b (8); *State* v. *Gibbs*, supra, 254 Conn. 601. In analyzing the language of § 53a-54b (8), we stated in *Gibbs* that neither statutory mandate for the commission of a capital felony should be interpreted in such a way so that the other statutory provision is deemed superfluous. *State* v. *Gibbs*, supra, 602. The defendant asks us essentially to ignore the other statutory provision by which a person can commit a capital felony: that the murders took place at the same time. In the present case, the evidence established that the defendant committed two separate sets of multiple murders: first killing Froelich and Gartrell between 4 p.m. and 4:30 p.m., and later killing Auerbach, Trusewicz and Hiltunen when they returned from work, no earlier than 5:35 p.m.

While double jeopardy prohibits multiple punishments for the same offense, "distinct repetitions of a prohibited act, however closely they may follow each other . . . may be punished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such

as are made punishable by the [statute]." (Citations omitted; internal quotation marks omitted.) *State* v. *Tweedy*, 219 Conn. 489, 497–98, 594 A.2d 906 (1991). In the present case, double jeopardy is not violated because the defendant committed multiple murders and the evidence indicates that these murders occurred in two sets, at distinctly separate times.

## IV

## DENIAL OF A *FRANKS* HEARING

The defendant next argues that the trial court improperly denied his request to hold a hearing, pursuant to *Franks* v. *Delaware*, supra, 438 U.S. 154, because an affidavit in support of a warrant to search the defendant's home and truck in North Carolina, as well as his person, contained three material misstatements and one material omission. The defendant contends that the case should be remanded for a *Franks* hearing. We disagree and conclude that the trial court properly denied the defendant's request for a *Franks* hearing.

"In order for a defendant to challenge the truthfulness of an affidavit underlying a warrant at a *Franks* hearing, he must: (1) make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit; and (2) show that the allegedly false statement is necessary to a finding of probable cause. . . . If the allegedly false statement is set aside, however, and there remains sufficient evidence to establish probable cause, a *Franks* hearing is not necessary. . . . Although the *Franks* decision referred only to false statements in the affidavit, we have held that material omissions from such an affidavit also fall within the rule . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Bergin*, 214 Conn. 657, 666, 574 A.2d 164 (1990). As the Supreme Court noted in *Franks*, "[t]here is, of course, a presumption

of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory . . . . There must be allegations of deliberate falsehood or of reckless disregard for the truth . . . ." *Franks* v. *Delaware,* supra, 438 U.S. 171.

In the present appeal, the defendant claims that the affidavit supporting the warrant to search his North Carolina home and Toyota truck, as well as his person, contained three material misstatements and one material omission. The alleged misstatements are: (1) the affiant, Sergeant Graham L. Keaton, of the sheriff's office in Currituck County, North Carolina, misstated that, shortly after midnight on "4-18-95," he had received a message from Connecticut state police concerning a request to locate the defendant at his residence in North Carolina. Because the crime occurred during the afternoon of April 18, 1995, Keaton could not have received a message concerning the crime *before* it had occurred; (2) Keaton misstated that the crime had occurred in Southbury, and not in Redding; and (3) Keaton misstated that the defendant had been seen at the crime scene "at the time the building burned . . . ." Finally, the defendant claims that Keaton omitted from his affidavit that Altamirano was an illegal alien. We address each of these claims in turn.

Keaton's reference to receiving a message from Connecticut state police shortly after midnight on April 18, 1995, is obviously a scrivener's error. Later in the affidavit, Keaton correctly reported that the building had burned "on 04-18-95 at 1800 hours . . . ." Common sense dictates that Keaton had intended to indicate that the message he had received from the Connecticut state police had been received by him shortly after midnight on April *19*, 1995, not April *18*, 1995. See *State* v. *Rosario,* 238 Conn. 380, 386–87, 680 A.2d 237 (1996) (obvious scrivener's error does not undermine magistrate's con-

clusion that probable cause exists for issuance of warrant).[14]

Neither does the fact that Keaton had misstated that the crime had occurred in Southbury, and not in Redding, serve to invoke the requirement that a *Franks* hearing should have been held. The trial court took judicial notice that Troop A of the Connecticut state police is located in Southbury and that the message received by the sheriff's office in North Carolina had emanated from Troop A in Southbury. Keaton's averment that the crime had occurred in Southbury was a result of the fact that the message had been received from that town. Whether the crime occurred in Southbury or in Redding had no bearing on the North Carolina magistrate's finding of probable cause.

We acknowledge, as did the trial court, that the third alleged misstatement, namely, that the defendant had been seen by witnesses "at the time the building burned," might be considered false.[15] Even if we were to assume, without deciding, that the statement had been made with knowledge of its falsity and that this

[14] The defendant makes the further general claim that, even if the date had been corrected to mean shortly after midnight on April 19, 1995, the affidavit was nevertheless defective because some of the information contained in it was not known by Connecticut police until later in the morning on April 19, 1995, after they interviewed Altamirano. We agree with the trial court that some of the information contained in the affidavit was based on continuing communications between Connecticut and North Carolina police *after* the initial midnight message on April 19, 1995. "In determining whether the warrant was based upon probable cause, we may consider only the information that was actually before the issuing judge *at the time he or she signed the warrant,* and the reasonable inferences to be drawn therefrom." (Emphasis added; internal quotation marks omitted.) *State* v. *Mordowanec,* 259 Conn. 94, 110, 788 A.2d 48 (2002). When the search warrant was signed by the North Carolina magistrate at 11:30 a.m. on April 19, 1995, the affidavit contained truthful information concerning the ongoing criminal investigation.

[15] As noted previously, Spear saw the defendant driving on Portland Avenue around 12:30 p.m., and Altamirano saw the defendant outside the building around 4 p.m.

fact should therefore be excised from the affidavit, we conclude that probable cause still existed for the warrant to issue.[16] The affidavit correctly stated that the defendant had been seen by a witness outside the building, "around the oil tank," just prior to the shootings. The affidavit also correctly reported that one of the victims "is confirmed to have been shot [and] the others too badly burned at this point for [the Connecticut state police] to yet advise." We conclude that these facts, together with the remaining unchallenged facts in the affidavit, would have been sufficient for the North Carolina magistrate to find probable cause to issue the warrant.

Finally, the defendant claims that Keaton omitted reference to the fact that Altamirano was an illegal alien. The defendant claims that if this fact had been disclosed to the North Carolina magistrate, probable cause would not have been found because Altamirano would have been deemed to be unreliable. We disagree. We cannot reasonably conclude that status as an illegal alien, standing alone, would have had any bearing on whether probable cause existed to authorize the search warrant. We conclude that the trial court properly denied the defendant's request for a *Franks* hearing.

## V

## JURY ARRAY CHALLENGE

The defendant also contends that the trial court improperly denied his constitutional challenge to the

---

[16] The test for discerning the existence of probable cause is well settled. "In determining the existence of probable cause to search, the magistrate should make a practical, commonsense decision whether, given all of the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . In making this determination [of probable cause], the magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reason-

jury array. Specifically, the defendant claims that there was an underrepresentation of Hispanic persons in the array. The defendant argues that the jury array in the Stamford-Norwalk judicial district violated his constitutional right to a jury comprised of a fair cross section of the community; see *Duren* v. *Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979); and to equal protection of the law. See *Castaneda* v. *Partida*, 430 U.S. 482, 494, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977). The defendant also argues that General Statutes (Rev. to 1997) § 51-217 (a) (3), as amended by No. 97-200, § 3, of the 1997 Public Acts,[17] which disqualifies persons who do not speak English from serving on juries in Connecticut, violates his right to equal protection. We find each of the defendant's contentions to be unavailing.

In *State* v. *Gibbs*, supra, 254 Conn. 593, 597, a case also involving a claim of Hispanic underrepresentation in a jury array, we rejected the defendant's challenge that the jury array procedures violated his right to a fair cross section and his right to equal protection. We also rejected the defendant's equal protection challenge to the English proficiency requirement contained in § 51-217 (a) (3). Id., 600. We will not revisit the same issues we so recently have decided.[18] The procedures

able inferences drawn by the magistrate." (Citations omitted; internal quotation marks omitted.) *State* v. *Cobb*, 251 Conn. 285, 317, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

[17] General Statutes (Rev. to 1997) § 51-217, as amended by No. 97-200, § 3, of the 1997 Public Acts, provides in relevant part: "(a) All jurors shall be electors, or citizens of the United States who are residents of this state having a permanent place of abode in this state and appear on the list compiled by the Jury Administrator under subsection (b) of section 51-222a . . . who have reached the age of eighteen. A person shall be disqualified to serve as a juror if such person . . . (3) is not able to speak and understand the English language . . . ."

[18] "The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 196, 676 A.2d 831 (1996). Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that

for summoning persons to serve on juries in Connecticut is the same throughout the state and, therefore, it makes little difference that our decision in *Gibbs* was based on a case from the judicial district of Hartford-New Britain, while the defendant's case originated in the Stamford-Norwalk judicial district. We will not engage in a piecemeal evaluation of jury array procedures for each of the state's judicial districts when the process for creating jury arrays is based on a general, statewide procedure. In the absence of additional evidence that the jury array procedures in the judicial district of Stamford-Norwalk present issues particular to that district, we reaffirm our holding in *Gibbs* and reject the defendant's contention that his constitutional rights have been violated by the jury array procedures to which he was subjected.[19] We also reaffirm our hold-

the law is relatively unchanging, it saves resources and it promotes judicial efficiency. *Conway* v. *Wilton*, 238 Conn. 653, 658–59, 680 A.2d 242 (1996). It is the most important application of a theory of decisionmaking consistency in our legal culture and it is an obvious manifestation of the notion that decisionmaking consistency itself has normative value. . . . Id., 658." (Internal quotation marks omitted.) *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 296, 695 A.2d 1051 (1997).

We realize that our decision in *Gibbs* was based on the jury selection system in effect in 1995; *State* v. *Gibbs*, supra, 254 Conn. 586 n.10; and that the procedures in effect at the time of the defendant's trial in the present case were based on General Statutes (Rev. to 1997) § 51-222a, as amended by No. 97-200, § 6, of the 1997 Public Acts, which became effective October 1, 1997. This discrepancy does not undermine the continued validity of our decision on this issue in *Gibbs*. Under *Gibbs*, the source list of potential jurors was comprised of licensed motor vehicle operators and registered voters. *State* v. *Gibbs*, supra, 586. Under the scheme in effect at the time of the defendant's trial here, the source list included both of these groups as well as "residents subject to taxation on personal income under chapter 229 and recipients of unemployment compensation under chapter 567." Public Act 97-200, § 6 (b). The procedures in effect at the time of the defendant's trial, therefore, arguably produced a greater pool of potential jurors than was in effect for our decision in *Gibbs*. The potential, therefore, for underrepresentation of Hispanics in the defendant's jury array was lower than the procedures that we found to be constitutional in *Gibbs*.

[19] The defendant alleges that the trial court unfairly prevented him from making a record by which he could challenge the jury array procedures when it denied his request to have potential jurors indicate their race and

ing in *Gibbs* that the English proficiency requirement of § 51-217 (a) (3) does not violate the equal protection clause of either the federal or the state constitutions. Id., 599–600.

## VI

### JURY INSTRUCTIONS ON REASONABLE DOUBT

The defendant's final claim is that the trial court's instruction on reasonable doubt was improper. Specifically, the defendant challenges the following portions of the trial court's instruction on the meaning of reasonable doubt: (1) "[a] reasonable doubt is a doubt for which, in your own mind, you can assign to yourself, a valid reason"; (2) "[a reasonable doubt] in other words, is a real doubt. It is an honest doubt"; (3) "[a reasonable doubt] is such a doubt that as in the serious affairs of every day life you would pay heed to"; and (4) "[proof beyond a reasonable doubt] leaves you firmly convinced of the defendant's guilt."[20] We reject the defendant's claim.

---

ethnicity on a questionnaire, and also denied his motion to dismiss, or in the alternative, his motion for a continuance so as to establish a record of unconstitutional procedures in creating the jury array. We agree with the trial court that, even if we were to assume that the defendant had data to show an underrepresentation of Hispanics, he had presented no evidence to show that the underrepresentation was the result of a systematic flaw in the selection process; *Duren* v. *Missouri*, supra, 439 U.S. 364 (third requirement in fair cross section challenge); or that the selection procedure was susceptible to abuse or not racially neutral. *Castaneda* v. *Partida*, supra, 430 U.S. 494 (third requirement in equal protection challenge).

[20] The trial court instructed the jury regarding reasonable doubt as follows: "Now, this phrase 'reasonable doubt' that I've used has no technical or unusual meaning. You can arrive at the real meaning of it by emphasizing the word 'reasonable.'

"A reasonable doubt is a doubt for which, in your own mind, you can assign to yourself a valid reason. It is a doubt which is something more than a guess or a surmise. It is not a conjecture or a fanciful or captious doubt. A reasonable doubt is not a doubt raised by someone for the sake of raising doubts, nor is it a doubt suggested by the ingenuity of a fellow juror which is not warranted by the evidence or lack of evidence.

"A reasonable doubt, in other words, is a real doubt. It is an honest doubt. It is a doubt which has its foundation in the evidence or lack of evidence.

"It is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) . . . . The [reasonable doubt concept] provides concrete substance for the presumption of innocence— that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . [Id.], 363. At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. *Jackson* v. *Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979). [Consequently, the] defendants in a criminal case are entitled to a clear and unequivocal charge by the court that the guilt of the defendants must be proved

It is such a doubt that as in the serious affairs of every day life you would pay heed to.

"Now, on the other hand, absolute certainty, of course, in the affairs of life is almost never attainable and the law doesn't require absolute certainty on the party of a jury before it returns a verdict of guilty.

"I charge you that there is no obligation on the part of the state to establish the elements of the crime beyond all doubt, for that would be virtually impossible. Proof beyond a reasonable doubt does not require proof that overcomes every possible doubt. On the other hand, proof beyond a reasonable doubt leaves you firmly convinced of the defendant's guilt.

"You must remember that a defendant is never to be convicted on mere suspicion or conjecture. So remember that the state's obligation is to prove the defendant guilty beyond a reasonable doubt. What the law does require is if, after reviewing in your mind, all of the evidence and giving consideration to all of the testimony, if there is something in that evidence or lack of evidence which leaves in the minds of you, the jury, as reasonable men and women, a reasonable doubt of the guilt of the accused, then you must give him the benefit of that doubt and find him not guilty.

"It necessarily follows that such proof beyond a reasonable doubt must preclude every reasonable hypothesis except guilt. The proof must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. If you can, in reason, reconcile all of the facts proved with any reasonable theory consistent with the innocence of the accused, then, of course, you cannot find him guilty."

beyond a reasonable doubt. . . . *State* v. *DelVecchio*, 191 Conn. 412, 419–20, 464 A.2d 813 (1983)." (Internal quotation marks omitted.) *State* v. *Velasco*, 253 Conn. 210, 247, 751 A.2d 800 (2000).

"We consistently have held that the definition of reasonable doubt as 'a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence,' as 'a doubt for which a valid reason can be assigned,' and as a 'doubt which in the serious affairs which concern you in every day life you would pay heed and attention to' does not dilute the state's burden of proof when such definitions are viewed in the context of an entire charge. See, e.g., [id.], 248; *State* v. *Morant*, 242 Conn. 666, 688, 701 A.2d 1 (1997); *State* v. *Kelley*, 229 Conn. 557, 567–68, 643 A.2d 854 (1994); *State* v. *Smith*, 210 Conn. 132, 147–50, 554 A.2d 713 (1989)." *State* v. *Whipper*, 258 Conn. 229, 297, 780 A.2d 53 (2001). In addition, our Appellate Court recently has concluded that an instruction that proof beyond a reasonable doubt means that the jury must be "firmly convinced" that the defendant is guilty of the crime charged does not dilute the state's burden of proof when taken in conjunction with the entirety of the court's instructions. *State* v. *Nunes*, 58 Conn. App. 296, 309, 752 A.2d 93, cert. denied, 254 Conn. 944, 762 A.2d 906 (2000). We conclude that the defendant here has offered no compelling reason for us to reconsider these cases. Moreover, we see no reasonable possibility that the challenged language, when read in the context of the entire charge regarding reasonable doubt, misled the jury in its understanding of the state's burden of proving the defendant's guilt beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other justices concurred.